# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 2745 | **DATE** | 7/29/2004 |
| **CASE TITLE** | Bennie Jackson vs. International Brotherhood, etc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter memorandum opinion and order granting Local 705's motion for summary judgment [doc. # 30-1]. This case is hereby terminated.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | **Document Number** |
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | JUL 30 2004 | |
| | Notified counsel by telephone. | | date docketed | 53 |
| ✓ | Docketing to mail notices. | | docketing deputy initials | |
| ✓ | Mail AO 450 form. | | JUL 30 2004 | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| DL | courtroom deputy's initials | | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

BENNIE JACKSON,      )
                  )
    Plaintiff,     )
                  )      **Judge Ronald A. Guzmán**
    v.         )
                  )      **02 C 2745**
**INTERNATIONAL BROTHERHOOD**  )
**OF TEAMSTERS, LOCAL UNION**  )
**NO. 705, AFL-CIO,**     )
                  )
    Defendant.    )

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant International Brotherhood of

Teamsters, Local Union No. 705's ("Local 705") motion for summary judgment. For the

reasons set forth below, Local 705's motion is granted.

DOCKETED

JUL 3 0 2004

## BACKGROUND

The following facts are undisputed or have been deemed admitted pursuant to

Local Rule 56.1. Local 705 is a Chicago area labor union comprising approximately

20,000 members employed in various aspects of the trucking industry. (Def.'s LR

56.1(a)(3) ¶ 1.) Plaintiff Bennie Jackson ("Jackson"), an African-American male, was

employed by Local 705 from 1994 until 2000, as a business agent/union representative.

(*Id.* ¶¶ 8-9.) In addition to his role as a business agent/union representative, Jackson also

was elected in 1995 and 1997 as Local 705's Recording Secretary. (*Id.* ¶ 9.) In these

elections, Jackson ran on a candidacy slate headed by Gerald Zero ("Zero"), Local 705's

Secretary-Treasurer.[1]  (*Id.*)

In approximately November 1999, Jackson became politically aligned with John McCormick ("McCormick"), Ed Benesch ("Benesch") and Steve Pocztowski ("Pocztowski").  (*Id.* ¶ 10.)  Each was an elected officer of Local 705 who in previous elections ran alongside Zero but opposed Zero's re-election in Local 705's fall 2000 elections.  (*Id.*)  On April 17, 2000, Zero terminated Jackson, McCormick, Benesch and Pocztowski from their elected positions.  (*Id.* ¶ 31.)  Shortly thereafter, on May 12, Jackson, McCormick, Benesch and Pocztowski filed suit in the U.S. District Court for the Northern District of Illinois, alleging that their terminations constituted an illegal retaliation against them for their union political activities in violation of the Labor Management Reporting and Disclosure Act, 29 U.S.C. § 412.  (*Id.* ¶ 4.)  On May 18, District Judge Milton Shadur issued a temporary restraining order, restoring Jackson *et al.* to their elected posts.  *McCormick v. Zero*, 110 F. Supp. 2d 716, 719 (N.D. Ill. Aug. 23, 2000).  A preliminary injunction was issued on August 23, 2000, *see id.* at 716, but following Zero and Local 705's appeal, the Seventh Circuit vacated the judgment of the district court and remanded the case for the district court to dismiss the case as moot because during the pendency of the appeal, Jackson *et al.* were defeated by Zero and his slate of candidates in the fall 2000 election.  *See McCormick v. Zero*, No. 00-3263, 2001 WL 219404, at *3 (7th Cir. 2001); Def.'s LR 56.1(a)(3) ¶ 10.

On March 31, 2000, Jackson filed a charge against Zero and Local 705 with the

---

[1]An elected position, Local 705's Secretary-Treasurer is the principal executive officer for the union. *See McCormick v. Zero*, 110 F. Supp. 2d 716, 722 (N.D. Ill. Aug. 23, 2000).

Illinois Department of Human Rights ("IDHR"). (Def.'s LR 56.1(a)(3) ¶ 11.) In the charge, Jackson alleged racial harassment and retaliation, mentioning Zero's distribution of Jackson's weekly activity report as an example of a bad report, the eviction[2] from his office and a racial slur. (*Id.*) The IDHR cross-filed with the Equal Employment Opportunity Commission ("EEOC") and on April 28, 2000, Jackson amended his charge, alleging that his April 17, 2000 termination, which occurred prior to his election loss in fall 2000, was racially motivated. (*Id.* ¶ 12.) On April 16, 2002, after the EEOC issued Jackson his right to sue letter on January 17, 2002, Jackson filed the present suit against Zero and Local 705, alleging various violations of Title VII, race discrimination in violation of 42 U.S.C. § 1981, retaliation under 42 U.S.C. § 1981, deprivation of his First Amendment rights in violation of 42 U.S.C. § 1983, as well as defamation. Pursuant to this Court's earlier Memorandum Opinion and Order, all counts save Jackson's Title VII claims against Local 705 were dismissed. *See Jackson v. Int'l Bhd. of Teamsters, Local Union No. 705*, No. 02 C 2745, 2002 WL 31572544, at *9 (N.D. Ill. Nov. 18, 2002).

In support of his Title VII claims against Local 705, Jackson alleges five specific factual incidents. (Pl.'s Resp. Def.'s Mot. Summ. J. at 2.) They include allegations mentioned in Jackson's IDHR charge, which include the weekly activity report distribution, eviction and termination, as well as the theft of items due to the eviction and Zero's mimicking of Jackson's speech and behavior patterns. The Court will examine each below.

---

[2]The Court notes that the parties differ in their characterization of the event. Jackson characterizes the event as an "eviction" while Local 705 contends that it was a "reassignment."

### 1.    Jackson's weekly activity report distribution

Local 705 requires its representatives, organizers and officers to complete
weekly activity reports in an effort to supervise their activities.  (Def.'s LR 56.1(a)(3) ¶
16.)  On February 10, 2000, Zero distributed a memorandum to Local 705's
representatives, organizers and officers, discussing the need to complete such reports and
attaching two reports as examples of what and what not to do.  (*Id.* ¶ 17.)  Jackson's
report was included in the memorandum as the "don't" report, thereby illustrating a bad
example, whereas a white employee's report was included as the "do."  (*Id.*)  Shortly
thereafter, at Local 705's executive board meeting, Jackson complained about the use of
his report and Zero subsequently apologized, indicating "its use was for example
purposes only."  (*Id.* ¶ 20.)

### 2.    Jackson's eviction

At the beginning of his employment by Local 705, Jackson worked from an office
cubicle.  (*Id.* ¶ 21.)  Sometime in 1995, separate offices were constructed and Zero
assigned Jackson one of the newly constructed offices.  (*Id.*)  However, on March 16,
2000, when Jackson was absent from Local 705's offices, Jackson was evicted from his
office and assigned to an office cubicle.  (*Id.* ¶ 22.)  As a result of the eviction, Jackson's
belongings and possessions were moved from his office.  (*Id.* ¶ 28.)

### 3.    Theft of items due to eviction

On March 17, 2000, at Local 705's executive board meeting, Jackson informed
those present that some of his belongings were missing following his eviction.  (*Id.*)

Jackson further reported that he filed criminal theft charges against Zero for the loss of a planner, grievance schedule, a computer disk as well as the $180 he had in his desk drawer. (*Id.*)

### 4. Mimicking of speech and behavior patterns

During the executive board meeting on March 17, in response to Jackson's theft allegations, Zero stated "to leave your money in your office drawer, you're a stupid goofball for doing something like that" in a way that mimicked Jackson's speech and behavior as an African-American. (*Id.* ¶ 29.)

### 5. Termination of employment

As mentioned above, on April 17, 2000, Zero terminated Jackson, McCormick, Benesch and Pocztowski from their elected positions. (*Id.* ¶ 31.) While in the *McCormick* legal action Jackson and the other plaintiffs had argued they were terminated for the exercise of their union political rights, see *McCormick*, 110 F. Supp. 2d at 718, Jackson presently argues that his termination was in response to his filing of a charge with the IDHR and that the contemporaneous terminations of McCormick, Benesch and Pocztowski were merely a pretext used by Zero. (Pl.'s Resp. Def.'s Mot. Summ. J. at 6-7.)

### DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

5

there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In analyzing Local 705's motion, this Court must view the facts in a light most favorable to Jackson, "drawing all reasonable inferences in [his] favor." *Haywood v. Lucent Techs. Inc.*, 323 F.3d 524, 529 (7th Cir. 2003). However, Jackson is not burden free as he "must set forth specific facts showing that there is a genuine issue for trial." *See* Fed. R. Civ. P. 56(e). Furthermore, "Rule 56(c) mandates the entry of summary judgment" if Jackson "fails to make a showing sufficient to establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

Before analyzing the parties' arguments, the Court notes the role and effect of Local Rule 56.1 in summary judgment proceedings. While Federal Rule of Civil Procedure 56 governs the parties' summary judgment obligations, Local Rule 56.1 reflects "an attempt to make the parties' respective summary judgment obligations explicit." *See Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994). With respect to parties opposing summary judgment, such as Jackson, their obligations are set forth in Local Rule 56.1(b).

Local Rule 56.1(b) requires each party opposing a summary judgment motion to serve and file a memorandum of law, any materials or affidavits referred to in Fed. R. Civ. P. 56(e) as well as a concise response to the movant's statement of facts. This response should contain "a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon" and "a

6

statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon." LR 56.1(b)(3)(A)-(B). Failure to properly meet the requirements to deny a moving party's statement of facts results in the moving party's version of the facts being deemed admitted. LR 56.1(b)(3)(B); *see also McGuire v. United Postal Serv.*, 152 F.3d 673, 675 (7th Cir. 1998) (noting that "[a]n answer that does not deny the allegations in the numbered paragraph with citations to supporting evidence in the record constitutes an admission").

Strict enforcement of Local Rule 56.1's requirements has been repeatedly upheld by the Seventh Circuit as "district courts are not obliged in our adversary system to scour the record looking for factual disputes." *Waldridge*, 24 F.3d at 922. This is so even in situations where the non-moving party may be able to create genuine issues of material fact. *See Bell, Boyd & Lloyd v. Tapy*, 896 F.2d 1101, 1102-03 (7th Cir. 1990) (discussing Local Rule 56.1's predecessor, Rule 12(m)).

With these principles in mind, the Court notes that Jackson has failed to comply with his obligations under Local Rule 56.1(b).[3] Of the forty-nine statements of fact submitted by Local 705 pursuant to their obligations under Local Rule 56.1(a)(3), twenty-two are undisputed. The vast majority of Jackson's responses to the remaining twenty-seven statements do not meet the requirements of Local Rule 56.1(b)(3)(A) by providing the Court with "*specific* references to the affidavits, parts of the record [or]

---

[3]While the Court mentions Jackson, it recognizes that the failures to follow Local Rule 56.1 do not result from any shortcomings of Jackson, but those of his counsel.

other supporting materials relied upon." LR 56.1(b)(3)(A) (emphasis added). That Jackson has not met his obligations under Rule 56.1 for a vast majority of his responses is not lost on Local 705 which argues that the "Union's statement of facts should be deemed admitted." (Def.'s Reply Mem. Supp. Def.'s Mot. Summ. J. at 2-3.)

For example, Jackson's response to fact number 13 is as follows: "DISPUTED: Jackson lacks sufficient information to address this point and therefore denies any and every position herein." (Pl.'s LR 56.1(b)(3)(A) ¶ 13; *see also id.* ¶¶ 34, 38.) Jackson's failure to provide any citation to the record in support of his denial of the fact statements in paragraphs 13-15, 17-18, 22, 25-26, 30, 31, 34, 36, 38 violates the letter of the local rule, and accordingly, those fact statements are deemed admitted. However, Jackson's failure to comply with the requirements of Local Rule 56.1 does not mean that summary judgment will automatically be granted in favor of Local 705, as the Court must still "evaluate all facts in the light most favorable [to Jackson], the non-moving party." *See Austin-Edwards v. Loyola Univ. Med. Ctr.,* No. 03 C 1915, 2004 WL 1243940, at *2 (N.D. Ill. June 3, 2004).

## I.    **Local 705's Preclusion Arguments**

In support of its motion for summary judgment, Local 705 contends that *McCormick v. Zero,* 110 F. Supp. 2d at 719, has a preclusive effect on the present case under two separate preclusion doctrines: res judicata and judicial estoppel. (Def.'s Mem. Supp. Mot. Summ. J. at 11-16.) The Court addresses each doctrine in turn.

## A. Res Judicata

Local 705 contends that by bringing both *McCormick* and the present case, Jackson is "splitting his cause of action into two lawsuits" when he should have litigated all his claims in *McCormick.* (Def.'s Mem. Supp. Mot. Summ. J. at 12, 14.) In opposing Local 705's arguments, Jackson contends that Illinois res judicata law applies. (Pl.'s Resp. Def.'s Mot. Summ. J. at 8-11.) However, "[b]ecause both the prior and the current litigation were brought in federal court, the federal principles of *res judicata*...will determine whether [Jackson's] prior suit bars him from maintaining this action." *See Little v. Tapscott*, No. 01 C 9738, 2002 WL 1632519, at *2 (N.D. Ill. July 23, 2002) (citing *In re Energy Coop. Inc.*, 814 F.2d 1226, 1230 (7th Cir. 1987)).

In the Seventh Circuit, "[r]es judicata bars not only those issues which were actually decided in a prior suit, but also all issues which could have been raised in that action." *Brzostowski v. Laidlaw Waste Sys., Inc.*, 49 F.3d 337, 338 (7th Cir. 1995). Accordingly, res judicata "requires two proceedings: an original proceeding wherein a final judgment on the merits is rendered, and a subsequent proceeding wherein a party seeks to litigate again a claim decided in the original proceeding." *Estate of Kanter v. Comm'r of Internal Revenue*, 337 F.3d 833, 871 (7th Cir. 2003).

With respect to the original proceeding in *McCormick*, the district court issued a preliminary injunction on August 23, 2000. *See* 110 F. Supp. 2d at 716. As mentioned above, Zero and Local 705 appealed the issuance of this injunction, but while the appeal was pending, Jackson *et al.* lost the fall 2000 election, thereby rendering the case moot. (Def.'s LR 56.1(a)(3) ¶ 10.) As a result, the Seventh Circuit vacated the judgment of the district court and remanded the case for the district court to dismiss the case as moot. *See*

*McCormick*, 2001 WL 219404, at *3. On remand, the district court's December 29, 2000 Order dismissed the case as moot without prejudice.

Local 705 contends that "[p]reliminary injunction decisions have the same preclusive effect, particularly when the circumstances make it likely that the findings are reasoned and reliable, such as when a court makes detailed findings after a full hearing, and the findings are appealable." (Def.'s Mem. Supp. Mot. Summ. J. at 13.) Local 705 further argues that preliminary injunctions have a preclusive effect even when mootness prevents a full trial on the merits. *Id.* However, this argument is not applicable in the present case as it applies to moot cases issuing preliminary injunctions where the district court decision has *not* been vacated by the appellate court.

In the Seventh Circuit, "[a]s a general rule, when a case becomes moot on appeal, the district court's decision is vacated in order to make sure that a decision that the loser was unable to get appellate review of does not have res judicata or collateral estoppel effect in subsequent litigation between the parties." *Gjertsen v. Bd. of Election Comm'rs of Chicago*, 751 F.2d 199, 202 (7th Cir. 1984). Because the Seventh Circuit vacated the district court's preliminary injunction judgment, *McCormick* does not have res judicata effect on the present lawsuit. Moreover, when a case is dismissed without prejudice as it was in *McCormick*, "'without prejudice' is a signal that a dismissal does not have a preclusive effect in future litigation."[4] *Hill v. Potter*, 352 F.3d 1142, 1146 (7th Cir. 2003). Consequently, lacking preclusive effect, *McCormick* and res judicata do not bar

---

[4]This statement is subject to an exception: dismissals for lack of subject matter jurisdiction "are preclusive with respect to the jurisdictional ruling." *Hill*, 352 F.3d at 1147.

Jackson from bringing the present lawsuit.

## B. Judicial Estoppel

Local 705 also argues for the application of another preclusion doctrine, judicial estoppel. Specifically Local 705 argues that "[it] is inconsistent for Bennie Jackson now to argue that the very same actions which he previously successfully contended were motivated by union politics were really motivated by race discrimination." (Def.'s Mem. Supp. Mot. Summ. J. at 15.)

Under judicial estoppel, "a party that has won a suit on one ground may not turn around and in another case obtain another judgment on an inconsistent ground." *Bethesda Lutheran Homes & Servs. v. Born*, 238 F.3d 853, 857-58 (7th Cir. 2001). Judicial estoppel is "intended to prevent improper use of judicial machinery" and as such "'is an equitable doctrine invoked by a court at its discretion.'" *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (internal quotation and citation omitted). However, "[i]t is not as if . . . judicial estoppel were something special, something unrelated to 'ordinary' estoppel, and perhaps therefore something available in cases to which the general principles of estoppel would not apply. The only thing special about judicial estoppel is that the misrepresentation is made to a court." *DeVito v. Chicago Park Dist.*, 270 F.3d 532, 535 (7th Cir. 2001). Because judicial estoppel is not unrelated to "ordinary" estoppel, the Court finds the language in *Gjertsen* controlling. Thus, because the Seventh Circuit vacated the district court's preliminary injunction judgment, *McCormick* and judicial estoppel likewise do not bar Jackson from bringing the present lawsuit.

The preclusion doctrines of res judicata and judicial estoppel are inapplicable in the present case. Accordingly, the Court turns to the merits of Jackson's Title VII claims.

## II.  Jackson's Title VII Claims

Pursuant to Counts I and III of his Complaint, Jackson seeks to hold Local 705 liable under Title VII of the Civil Rights Act for race discrimination, hostile work environment and retaliation. The Court analyzes each claim in turn.

### A.  Race Discrimination/Disparate Treatment

Title VII prohibits employers from discharging or discriminating against any individual with respect to his or her "compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). As plaintiff, Jackson has two methods available to him to prove employment discrimination under Title VII: the direct and indirect methods. *See Cerutti v. BASF Corp.,* 349 F.3d 1055, 1060 (7th Cir. 2003).[5]

### 1.  The Direct Method

Under the direct method, Jackson "may show, by way of direct or circumstantial

---

[5]The Seventh Circuit employs "essentially the same analytical framework to employment discrimination cases whether they are brought under the ADEA, Title VII, or § 1981." *Cerutti,* 349 F.3d at 1060 n.4; *see also Williams v. Waste Mgmt. of Ill., Inc.,* 361 F.3d 1021 (7th Cir. 2001) (noting that "Section 1981 claims are evaluated under the same rubric as Title VII claims"). Thus, even if Jackson's section 1981 claims had survived the motion to dismiss earlier in this litigation, these claims would have been treated the same as his Title VII claims.

evidence, that his employer's decision to take an adverse job action against him was motivated by an impermissible purpose, such as race...." *Id.* at 1061. Although not found in the present case, "[d]irect evidence is evidence that, if believed by the trier of fact, would prove discriminatory conduct on the part of the employer without reliance on inference or presumption." *Id.* Essentially, direct evidence "requires an admission by the decision-maker that his actions were based on the prohibited animus." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000). Jackson may also prevail under the direct method by showing a "convincing mosaic of circumstantial evidence," provided that evidence points "directly to a discriminatory reason for the employer's action." *Davis v. Con-Way Transp. Central Express, Inc.*, 368 F.3d 776, 783 (7th Cir. 2004) (internal quotation and citation omitted).

Just as Jackson lacks direct evidence of discrimination, he similarly lacks circumstantial evidence sufficient to construct a "convincing mosaic" of discrimination. *See id.* Assuming *arguendo* that an adverse job action indeed occurred, the five instances of mistreatment Jackson alleges do not point directly to a discriminatory reason for Local 705's actions. In fact, not including Zero's mimicking, none of the remaining instances have racial implications. Moreover, the instance that does have a racial implication, Zero's single instance of mimicking Jackson's speech and behavior, does not point "directly to a discriminatory reason for the employer's action." *Id.* Because Jackson is unable to proceed on his race discrimination claim under the direct method, the Court will examine whether he can proceed under the indirect method.

### 2.    The Indirect Method

As plaintiff, Jackson has the burden of establishing a *prima facie* case for race discrimination by showing: "(1) he was a member of a protected class; (2) he was meeting his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) other similarly situated employees who were not members of his protected class were treated more favorably." *Davis,* 368 F.3d at 784. An employee who is able to set forth a *prima facie* case for race discrimination shifts the burden of production to the employer "to show a legitimate, non-discriminatory reason for its employment action." *Wells v. Unisource Worldwide Inc.,* 289 F.3d 1001, 1006 (7th Cir. 2002). Once the employer provides such a reason, then burden of production returns to the employee to show that the employer's reason is pretextual. *Id.* While the burden of production may shift to the defendant, at all times the burden of persuasion rests with the employee. *Haywood,* 323 F.3d at 531.

As an African-American, it is undisputed that Jackson is a member of a protected class. As is typically the case, the main elements at issue are numbers three and four: whether Jackson suffered an adverse employment action and whether similarly situated employees were treated differently.

### a.    Adverse Employment Action

"Title VII prohibits employers from discriminating against employees with respect to the 'terms, conditions or privileges of employment.'" *Traylor v. Brown,* 295 F.3d 783, 788 (7th Cir. 2002) (citing 42 U.S.C. § 2000e-2(a)(1)). Specifically, Jackson "must show that [he] suffered a materially adverse employment action," a factually dependant determination. *Id.* (citing *Haugerud v. Amery Sch. Dist.,* 259 F.3d 678, 691

14

(7th Cir. 2001)). While Title VII does not overtly define "adverse employment action," see *Wei v. Chicago State Univ.*, No. 01 C 7509, 2003 WL 22048081, at \*5 (N.D. Ill. Aug. 29, 2003), the Seventh Circuit "has defined an adverse employment action as a 'materially adverse change in the terms and conditions of employment [that is] more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Cerros v. Steel Techs., Inc.* 288 F.3d 1040, 1044 (7th Cir. 2002) (quoting *Stockett v. Muncie Ind. Transit Sys.,* 221 F.3d 997, 1001 (7th Cir. 2000)).

As discussed above, Jackson alleges five specific factual instances in support of his race discrimination claim. They include the weekly activity report distribution, Jackson's eviction and reassignment from his office, the theft of personal items following the eviction, Zero's mimicking of Jackson's speech and behavior patterns as well as Jackson's termination from employment.

Applying the Seventh Circuit's definition of adverse employment action, it is clear that Zero's distribution of Jackson's weekly activity report as a poor example of such a report, Jackson's eviction from his office and reassignment to a cubicle, the theft resulting from Jackson's eviction and Zero's mimicking of Jackson's speech and behavior do not fit within this definition as these instances neither changed the terms and conditions of Jackson's employment nor presented anything more than a mere inconvenience.

First, the distribution of Jackson's report, which was used to illustrate an incorrect example and was unaccompanied by a tangible job consequence, see Def.'s LR 56.1(a)(1) ¶ 17, does not constitute an adverse employment action. *See, e.g., Volovsek v. Wis. Dep't of Agric., Trade, & Consumer Prot.,* 344 F.3d 680, 688 (7th Cir. 2003)

15

(quoting *Grube v. Lau Indus.*, 257 F.3d 723, 729 (7th Cir. 2001)) (noting that "unfair reprimands or negative performance evaluations, unaccompanied by some tangible job consequence, do not constitute adverse employment actions").

Next, Jackson's eviction/reassignment, and the resulting theft thereafter do not constitute adverse employment actions. In *Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1119 (7th Cir. 2001), the Seventh Circuit held the plaintiff, who was a mechanic working at Wal-Mart, had not established that his employer's treatment of him constituted adverse employment actions. The court noted that the plaintiff's assignment to work in an area known as "the cage," his subsequent assignment to an area with no workbench, lighting or outlets, the deprivation of his tool box as well as a prohibition on using a computer to document parts he used did not constitute adverse employment actions. *See id.* at 1119 n.2. The court noted that the plaintiff provided "no evidence that work in the cage involved lower pay [or] different hours," or that his assignment to an area with no workplace, lighting or outlets was inadequate. *Id.* Further, "[r]egarding his claim that he was deprived of his tool box, [the court noted that the plaintiff presented] no evidence to indicate who deprived him of his tool box and why and whether that action also deprived him of the ability to complete his work . . . ." *Id.*

Similar to the plaintiff in *Kersting*, Jackson has provided no evidence that his work in the cubicle involved lower pay or different hours or constituted a "materially adverse change in the terms and conditions of employment [that is] more disruptive than a mere inconvenience or an alteration of job responsibilities." *Cerros*, 288 F.3d at 1044 (citation omitted). He has not alleged that the cubicle was inadequate. Also, similar to the plaintiff in *Kersting*, Jackson provided no evidence (in the manner required of him by

16

Local Rule 56.1) attributing the theft of his personal items following his eviction to Local 705.[6] Thus, Jackson's eviction and reassignment and theft of personal items do not constitute adverse employment actions. However, because the Court holds that Jackson's termination from employment constitutes an adverse employment action, the Court will consider whether there were similarly situated employees who were given more favorable treatment by Local 705.

### b. Similarly Situated Employees

As mentioned above, Jackson has the burden to show that "other similarly situated employees who were not members of his protected class were treated more favorably." *Davis*, 368 F.3d at 784. "To meet his burden of demonstrating that another employee is 'similarly situated,' a plaintiff must demonstrate that there is someone who is directly comparable to him in all material respects." *Grayson v. O'Neill*, 308 F.3d 808, 819 (7th Cir. 2002).

Jackson has not shown that other similarly situated employees, who were not African-American, were treated more favorably. Specifically, when Jackson was

---

[6]Even if Jackson were able to establish that his eviction constituted an adverse employment action, he is unable to show that Local 705's stated reason for his reassignment was pretextual. According to Local 705, the reason why Zero "reassigned" Jackson was because Zero "determined that the Union's organizers needed to have a separate office and decided to reassign Bennie Jackson to an office cubicle in order to use that office for the organizers." (Def.'s LR 56.1(a)(3) ¶ 22.) In response to this statement, Jackson responded: "DENIED...The lone organizer, Gregory Foster, a Black, Male, never occupied the old Jackson office, which was occupied by Paul DiGrazia, a white, male, Union Representative (not then an organizer). The lone organizer, a Black Male, remained in the open area." (Pl.'s LR 56.1(b)(3)(A) ¶ 22.) However, because Jackson failed to conform his response to the requirements of Local Rule 56.1 by citing the portion of the record that supports his denial, Local 705's reason for Jackson's eviction is deemed admitted and the Court need not determine whether that reason was pretextual as the Court is not obliged "to scour the record looking for factual disputes." *Waldridge*, 24 F.3d at 922.

terminated on April 17, 2000, he was not the only employee terminated as Zero also terminated McCormick, Benesch and Pocztowski from their elected positions. (Def.'s LR 56.1(a)(3) ¶ 31.) McCormick, Benesch and Pocztowski are all Caucasian and were elected officers of Local 705 like Jackson. (*Id.*) As such, they are directly comparable to Jackson. Accordingly, since McCormick, Benesch and Pocztowski are directly comparable to Jackson and as Caucasians, are not members of Jackson's protected class, Jackson is unable to satisfy this element of his *prima facie* case.

Because Jackson is unable to establish a *prima facie* case for race discrimination, he is unable to shift the burden of production to Local 705 "to show a legitimate, non-discriminatory reason for its employment action." *Wells,* 289 F.3d at 1006. As a result, there is no genuine issue of material fact with respect to Jackson's claim for race discrimination and the Court turns to Jackson's hostile work environment claim.

**B.     Hostile Work Environment**

Title VII also prohibits employers from maintaining a hostile work environment. *Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 426 (7th Cir. 2004). "A hostile environment is one that is 'permeated with discriminatory intimidation, ridicule and insult.'" *Id.* (quoting *Shanoff v. Ill. Dep't of Human Servs.*, 258 F.3d 696, 704 (7th Cir. 2001)). In order for Jackson to state a hostile work environment claim under Title VII, he must demonstrate: "1) he was subject to unwelcome harassment; 2) the harassment was based on his race . . . ; 3) the harassment was severe [or] pervasive so as to alter the conditions of the employee's environment and create a hostile or abusive working environment; and 4) there is basis for employer liability." *Id.* (internal quotations

18

omitted).

In determining whether the harassment in the workplace is severe or pervasive, courts look to the surrounding circumstances which "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). However, as the Seventh Circuit has recently noted, "[n]ot every unpleasant workplace is a hostile environment." *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 977 (7th Cir. 2004). Specifically, "[t]he workplace that is actionable is the one that is hellish." *Id.*

Following these principles, the Seventh Circuit did not reverse the district court's finding that a racially hostile work environment existed toward black union pipefitters when the harassment consisted of graffiti and other acts. *See EEOC v. Pipefitters Ass'n Local Union No. 597*, 334 F.3d 656, 658 (7th Cir. 2003). In *Pipefitters*, the graffiti included racially derogatory statements such as "death to all niggers," and "Fergie [plaintiff James Ferguson], if you don't want to be treated like a nigger, don't act like one." *Id.* Additional acts further contributing to the court finding a hostile work environment included "the placing of a swastika in a black pipefitter's toolbox, the hanging of a Ku Klux Klan poster in a trailer used by black pipefitters during breaks, and the display of a hangman's noose." *Id.*

The five instances Jackson alleges for his hostile work environment are in stark contrast to those presented in *Pipefitters*. The work environment that Jackson alleges is not "permeated" with discrimination because the five instances alleged by Jackson collectively lack the severity or pervasiveness needed to create an actionable hostile work

19

environment. First, Jackson was neither repeatedly subjected to racially derogatory terms nor physically threatened. Second, Jackson has not alleged that his eviction and subsequent reassignment to an office cubicle unreasonably interfered with his work performance. Further, he has not alleged facts attributing the theft of his personal items to Local 705. Finally, only one instance, Zero's mimicking of Jackson's speech and behavior, was on its face racially harassing, but because of its infrequency was neither severe nor pervasive. *See Russell v. Bd. of Trs. of Univ. of Ill. at Chicago*, 243 F.3d 336, 344 (7th Cir. 2001) (citing *Ngeunjuntr v. Metro. Life Ins. Co.*, 146 F.3d 464, 467-68 (7th Cir. 1998)) (noting that "relatively isolated comments suggesting bias against ethnic minorities [was] insufficient to survive summary judgment"). While Jackson may have subjectively felt that Local 705's workplace environment was unpleasant, his allegations of harassment neither create a "hellish" workplace nor one that is "permeated with discriminatory intimidation, ridicule and insult." *Shanoff*, 258 F.3d at 704. As a result, no genuine issue of material fact exists with respect to Jackson's hostile work environment claim.

### C.    Retaliatory Discharge

Under Title VII, an employer is prohibited from retaliating against an employee who has "opposed any practice made an unlawful employment practice...or...has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." 42 U.S.C. § 2000e-3(a). "[U]nlawful retaliation occurs when an employer takes an adverse employment action against an employee for opposing impermissible discrimination." *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003). Jackson

alleges that the termination from his elected post was in retaliation for the filing of his

charge with the IDHR.[7] As with his race discrimination claim, Jackson has two methods

with which to establish a *prima facie* case of retaliation: the direct method and the

indirect method.

### a. Direct Method

Pursuant to the direct method, Jackson must present either direct or circumstantial

evidence showing "a statutorily protected activity, an adverse employment action, and a

causal connection between the two." *Haywood*, 323 F.3d at 531. As mentioned above,

direct evidence "requires an admission by the decision-maker that his actions were based

on the prohibited animus," *Radue*, 219 F.3d at 616, whereas circumstantial evidence

"allows a jury to infer intentional discrimination by the decisionmaker." *Rogers*, 320

F.3d at 753.

As a general rule, there "can be no causal link between protected activity and an

adverse employment action if the employer remained unaware of the protected activity."

*Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1458 (7th Cir. 1994). It is not disputed

that Jackson engaged in a statutorily protected activity when he filed his charge with the

IDHR. It is further undisputed that the alleged retaliatory action, Jackson's termination,

constitutes an adverse employment action. At issue is whether Jackson can prove

---

[7]Jackson's eviction and reassignment is not properly considered retaliatory as it was made prior to Jackson's filing of the charge with the IDHR and was one of the events listed on the charge as discriminatory. *See* Def.'s LR 56.1(a)(3) ¶ 11. Even if it were in retaliation, Jackson would be unable to make a *prima facie* case for retaliation because, as discussed earlier, the eviction and reassignment cannot be properly considered an adverse employment action.

causation under the direct method. He cannot.

As noted above, Jackson filed his charge with the IDHR on March 31, 2000, which he later amended to include his April 17, 2000 termination. (Def.'s LR 56.1(a)(1) ¶¶ 11-12.) However, as deemed admitted, Local 705 was unaware of Jackson's charge with the IDHR until May 3, 2000, when it received its first notification of Jackson's charge. (*See* Def.'s LR 56.1(a)(1) ¶ 13.) An earlier notice, postmarked April 12, 2000, was returned to the IDHR, stamped: "Return to Sender, Insufficient Address."[8] (*Id.*) Furthermore, Jackson has made no allegation that Local 705 knew of his charge another way. Accordingly, because Local 705 was unaware of the protected activity at the time of Jackson's termination, Jackson is unable to establish the requisite causal link under the direct method. As a result, the Court will examine whether Jackson can proceed under the indirect method.

### b.    Indirect Method

Under the indirect method, Jackson "must show: (1) he engaged in a statutorily protected activity; (2) he performed his job according to his employer's legitimate expectations; (3) despite his satisfactory job performance, he suffered an adverse action from the employer; and (4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity." *Davis,* 368 F.3d at 788. Additionally, while relevant under the direct method, the decisionmaker's lack of

---

[8]Jackson's response is as follows: "DISPUTED: Jackson lacks sufficient information to address this point and therefore denies any and every position herein." (Pl.'s LR 56.1(b)(3)(A) ¶ 13.) Again, Jackson points to no evidence which would call this into dispute.

knowledge of a statutorily protected activity is irrelevant under the indirect method, as it "only goes to the causal nexus requirement of the direct method." *Gonzalez v. Neustar, Inc.*, No. 02 C 7404, 2003 WL 22872108, at *6 (N.D. Ill. Dec. 4, 2003) (citing *Maarouf v. Walker Mfg. Co.*, 210 F.3d 750, 755 (7th Cir. 2000)).

Jackson's retaliatory discharge claim suffers from the same infirmity that his claim for race discrimination does, specifically, whether he was treated less favorably than similarly situated, non-African-American employees who did not engage in statutorily protected activity. Jackson is unable to meet this fourth element because when Jackson was terminated from his elected position on April 17, 2000, McCormick, Benesch and Pocztowski were also terminated from their elected positions. (Def.'s LR 56.1(a)(3) ¶ 31.) McCormick, Benesch and Pocztowski are all Caucasian, are politically opposed to Zero, and did not file a race discrimination charge. Accordingly, because similarly situated Caucasian employees who did not complain of discrimination were terminated at the same time as Jackson, he is unable to present a *prima facie* case of retaliation. Because Jackson cannot state a *prima facie* case, he is unable to shift the burden of production to Local 705 to state a legitimate non-discriminatory reason for his termination and as such the Court need not analyze whether that reason was a pretext for discrimination.

## CONCLUSION

For the reasons set forth above, the Court grants Local 705's motion for summary judgment [doc. no. 30-1]. This case is hereby terminated.

**SO ORDERED**                    **ENTERED:**   JUL 2 9 2004


*Ronald A. Guzman*

**HON. RONALD A. GUZMAN**
**United States Judge**